**SHAW ACQUISITION COMPANY,
d/b/a Stewart Lumber Company,
Respondent,**

v.

**The BANK OF ELK RIVER,
Appellant.**

**No. C2–00–1803.**

Court of Appeals of Minnesota.

May 29, 2001.

Mark J. Johnson, Lang, Pauly, Gregerson & Rosow, Ltd., U.S. Bank Place, Minneapolis, (for respondent).

James M. Neilson, Matthew A. Anderson, Babcock, Neilson, Mannella, LaFleur & Klint, P.L.L.P., Anoka, (for appellant).

Gerald G. Workinger, Jr., Edina, (for amici curiae Minnesota Bankers Association, Mortgage Bankers Association of Minnesota and Independent Community Bankers of Minnesota).

Considered and decided by SHUMAKER, Presiding Judge, RANDALL, Judge, and PETERSON, Judge.

## OPINION

RANDALL, Judge.

Appellant challenges the district court's order granting respondent's motion for

summary judgment. Appellant argues that the district court erred in concluding that appellant's foreclosure sale produced a surplus after appellant's first-priority mortgage was satisfied. Appellant claims that its split-priority junior mortgage must be satisfied also before respondent's second-position mechanic's lien gets paid. We affirm.

## FACTS

On March 5, 1998, appellant Bank of Elk River acquired two mortgages, $105,000 each, and two notes from Allied Mortgage on two properties (North and South) Allied sought to develop. Both mortgages were recorded the same day. Allied and appellant did not enter into a construction-loan agreement. Appellant advanced $61,731.41 on the North note and $36,731.41 on the South note between March 5, 1998, and March 23, 1998. On the March 23, the first improvements on the North and South properties were visible.

The district court found respondent Shaw Acquisition Company provided lumber and other building materials to the North property in the amount of $26,432.75 and plans and specifications for the improvement of the South property. No lien waivers were requested or given. On December 24, 1998, respondent filed and recorded a mechanic's lien against both the North and South properties.

On January 26, 1999, respondent filed a summons and complaint to foreclose its mechanic's lien. After negotiations, the bank and Stewart Lumber entered into a stipulation, which split the priority of appellant's mortgages. Appellant had advanced approximately $98,000 before respondent's mechanic's lien and an approximate $112,000 (excluding costs and interest) after respondent's mechanic's lien. The negotiations between the par-

ties gave appellant first position on its initial $98,000 advances, gave respondent's mechanic's lien of $43,253.76 a second-priority position, and gave appellant a third position on its remaining advances. Appellant's advances prior to March 23, 1998, in the amount of $61,731.41 (plus $134.62 in taxes) for the North property and $36,731.41 (plus $183.90 in taxes) for the South property, received first-priority positions. Appellant's advances on the mortgage after March 23, 1998, were the third priority.

On March 3, 2000, judgment was entered on the mechanic's-lien foreclosure. The judgment confirmed the stipulation that split the priority of appellant's mortgages and gave respondent's mechanic's lien second position. This judgment was not appealed.

As part of its argument, both appellant and the amici curiae allege facts that would challenge the mechanic's lien second-priority position. We quickly conclude that the stipulation between the parties and the resulting judgment, which was not appealed, properly gave respondent's mechanic's lien a true second-priority position. The primary issue remains, namely, what steps will respondent have to take to receive a distribution from a foreclosure sale. Appellant chose to foreclose on its mortgages by advertisement. At the foreclosure sale on March 23, 2000, appellant bid approximately $245,000 for both parcels. That figure represented the total amount of its first and third-priority mortgages plus all costs and accrued interest. Appellant then sent respondent two letters (one for the North property and one for the South property) on April 4, 2000, informing it that it had until May 23, 2000, to redeem from its second-priority position. The letters noted that respondent could redeem by paying just the first-

priority positions amount (approximately $99,000 plus costs).

On April 12, 2000, appellant filed notices of intent to redeem from its third-priority positions (in the event that respondent redeemed from its second-priority position). Respondent then filed a summons and complaint alleging that appellant improperly withheld a surplus from the foreclosure. Respondent defined the surplus as the amount remaining out of appellant's bid of $245,000 after appellant's first position of approximately $99,000 was satisfied. The district court granted respondent's summary-judgment motion concluding the foreclosure produced a surplus after satisfying the first-priority parts of the mortgages. It awarded respondent judgment in the full amount of its second-priority mechanic's lien. This appeal followed.

## ISSUE

Should the proceeds from a foreclosure sale in excess of the amount necessary to satisfy a part of a mortgage with seniority be distributed to valid intervening lienors according to their priority without requiring the junior lienor to redeem? With a split-priority mortgage, when is the most junior portion entitled to distribution when there is a valid intervening lien?

## ANALYSIS

When the district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion reviewed de novo by the appellate court. *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998). The district court determined that there were excess proceeds after appellant's first-priority parts of the mortgages were satisfied and determined that the excess should be used to extinguish respondent's second-priority lien prior to application of the proceeds to appellant's re-

maining parts of the mortgages in third priority. Appellant argues that under Minn.Stat. § 580.10 (2000), a surplus exists only if the mortgage has been satisfied. Appellant defines its multiple advances, which resulted in both a first and a third position, as "a mortgage." Appellant cites the statute, which states:

> In all cases not provided for in section 580.09, if, after sale of any real estate, made as herein prescribed, there remains in the hands of the officer making the sale any surplus money, *after satisfying the mortgage*, with interest, taxes paid, and costs of sale, the surplus shall be paid over by such officer, on demand, to the mortgagor, the mortgagor's legal representatives or assigns.

*Id.* (emphasis added). We do not dispute the plain language of the statute. We simply note that the words of the statute, when drafted, impliedly understand the word "mortgage" to be a simple undivided mortgage, and appellant concedes that. With that understanding, the statute and respondent's legal argument, and the stipulation and judgment between the parties for a split priority for appellant falls into place.

That statute does not describe split mortgages. Minnesota's "race-notice" statute, which has stood for decades and is understood by all lenders and their attorneys, contemplates such a situation. *See Axel Newman Heating & Plumbing Co. v. Sauers*, 234 Minn. 140, 145, 47 N.W.2d 769, 772 (1951) (holding where advances on a mortgage are optional, subsequent encumbrance takes priority over advances made after mortgagee receives actual notice of subsequent encumbrance). Appellant argued consistently that its first and third positions, to which appellant stipulated, are not separate mortgages, but are single mortgages with split priorities. In a race-notice state, it is a distinction without a

difference. Under appellant's theory, a lender with a first position could then, with impunity, lend money, after five valid intervening liens, take a seventh, eighth, ninth, etc. position, and even if that lender forecloses by advertisement (not by action so as to get a judicial lien), all it would have to do is bid in the cumulative total of its several mortgages, ignore the five valid intervening liens senior to every mortgage except the first, and require all senior-intervening liens to redeem the first.

Appellant contends that those with valid intervening liens should invoke their right to redemption. Here, respondent had the chance to redeem, but it chose not to. Appellant implies that because redemption was available, respondent was required to avail itself of that option. There is no authority that *requires* a junior lienor to exercise its option to redeem. The right to redeem is separate from the right to recover excess proceeds from a foreclosure sale. If respondent wanted to exercise the option and move its priority position up, it had that choice, but we conclude it was not *required* to exercise that option. Rather than invest money into questionable property by redeeming to "move up," a junior lienor may decide to do nothing and see what the foreclosure bids amount to. Appellant continues to insist that no surplus exists until all parts of the mortgages, first and third priority, etc. (even with split priorities, as here) positions are satisfied claiming that the amount received at a foreclosure must satisfy the entire debt under Minn.Stat. § 580.225 (2000) (stating "amount received from foreclosure sale * * * is full satisfaction of the mortgage debt"). Appellant argues that the term "mortgage debt" includes any and all split-priority mortgages, regardless of the number of valid intervening liens. Appellant argues that if it were to bid only the amount of its first priorities, its third-priority positions would no longer exist because those third-priority positions would be extinguished pursuant to Minn. Stat. § 580.225.

This case does not turn, as appellant claims, on the technical meaning of surplus. As we noted earlier, appellant conceded the statute contemplated the old-fashioned, indivisible, first-position mortgage. The amount of money appellant bid over the amount of its first position was simply a $245,000 bid for two pieces of property. The properties had first-position mortgages of approximately $99,000 (appellant's), respondent's second-position lien of approximately $43,000, and then appellant's third-position mortgages of approximately $112,000 (plus other junior liens not at issue). As respondent argues, appellant as high bidder got the property for $245,000 subject to its own first lien, and next, respondent's.

Both appellant and amici curiae assert that affirming the district court will result in dire consequences. They assert that banks will be reluctant to lend money on construction projects for fear that their mortgage-money advances (liens) will slip down the ladder of priorities and, thus, recovery of the lender's principal and interest may be in jeopardy. We can only state that while that might be considered a penalty, there is a simple cure.

> It is well settled in this state that a mortgage given to secure future advances, which advances are in fact later made, has priority over mechanics' liens attaching after the mortgage is given, but before the advances are made, where the making of the advances was *obligatory* upon the mortgagee under the terms of this contract with the mortgagor.

*Erickson v. Ireland,* 134 Minn. 156, 158, 158 N.W. 918, 919 (1916) (emphasis added). But if the advances are optional, as is

conceded here, because there is no construction agreement setting out obligatory advances, intervening mechanic's liens have priority. *Model Home Bldg., Inc. v. Turnquist,* 258 Minn. 53, 56, 102 N.W.2d 717, 719 (1960). Appellant's failure to have a construction-loan agreement in place that set out obligatory advances resulted in respondent legally obtaining a second-priority position for its mechanic's lien.

It is rare for a bank to accept a mortgage on a site under construction without entering into a construction-loan agreement. Appellant did just that. The Minnesota Supreme Court outlined the cure. Appellant and amici curiae need only write the proper construction loan agreement. The cure here, to draw up a construction-loan agreement, that will save all advances made after legitimate workmen have improved the lot and filed legitimate mechanics' liens, is no more difficult than writing and recording a standard first-position purchase-money mortgage.

Finally, both sides spent a considerable amount of time arguing for and against *R.B. Thompson v. Rothschild Financial Corp.,* 1991 WL 222436 (Minn.App.1991), an unpublished decision of this court. We initially note that unpublished opinions of this court are of limited value in deciding an appeal. See Minn.Stat. § 480.08, subd. 3(c) (2000) ("[u]npublished opinions of the court of appeals *are not precedential*") (emphasis added); *Dynamic Air, Inc. v. Bloch,* 502 N.W.2d 796, 801 (Minn.App. 1993) (stating dangers of mis-citation and unfairness associated with use of unpublished opinions and that while persuasive, "[t]he legislature has unequivocally provided that unpublished opinions are not precedential"). Moreover, our decision today does not rest on *Rothschild.* An examination of *Rothschild* shows that its fact situation was sui generis. Appellant and the amici curiae are correct in noting that the facts surrounding *Rothschild* are unique. For instance, the mechanic's-lien foreclosure action in *Rothschild* did not occur until years after the original mortgage-foreclosure sale on the property. In addition, the district court determined that there was a surplus from the original foreclosure at the mechanic's-lien foreclosure action. *That determination of a surplus was not appealed.* Finally, we also note that the initial foreclosure action occurred in 1984, but the appeal did not reach this court until 1991. *Rothschild* simply rests on the facts of its case.

## DECISION

The district court properly granted respondent's motion for summary judgment and properly ordered that proceeds from the foreclosure sales in excess of appellant's first-priority mortgages be distributed to satisfy respondent's second-priority mechanic's lien.

**Affirmed.**